**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| KAYLAN M.[1],<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY[2],<br><br>Defendant. | CASE NO. 3:25-CV-00342-SJF |

**OPINION and ORDER**

Plaintiff Kaylan M. ("Mr. M")[3] seeks judicial review of the Social Security Commissioner's decision denying Mr. M's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). This Court may enter a ruling in this matter based on the parties' consent under 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g). [DE 12]. For the reasons discussed below, the Court affirms the decision of the Commissioner of the Social Security Administration ("SSA").

## I. OVERVIEW OF THE CASE

Mr. M protectively filed a Title II application for a period of disability and DIB on October 19, 2022, alleging disability beginning July 17, 2022. (Administrative Record 10,

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name and last initial only.
[2] Frank J. Bisignano became the Commissioner of the Social Security Administration on May 7, 2025. Under Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g), Frank Bisignano is substituted as the defendant in this suit.
[3] Consistent with the agency's decision, the Court refers to Plaintiff as "Mr. M" and uses pronouns he/him/his.

hereinafter "AR"[4]). His claim was denied initially on March 16, 2023, and again upon reconsideration on August 10, 2023. (AR 10, 98, 109). Mr. M then requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ conducted a telephone hearing on January 18, 2024. (AR 10, 51–78). Mr. M appeared with counsel. An impartial vocational expert, Darren Wright, also testified. (*Id.*). The ALJ issued an unfavorable decision on March 22, 2024. (AR 7–24). The Appeals Council denied Mr. M's request for review on February 27, 2025, making the ALJ's decision the final decision of the Commissioner. (AR 1–6); *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Mr. M filed suit in this Court on April 22, 2025. [DE 1]. The parties consented to the jurisdiction of a United States Magistrate Judge, and the case was reassigned to the undersigned for all purposes on July 8, 2025. [DE 12]. Mr. M filed his opening brief on August 4, 2025. [DE 15]. The Commissioner filed a response on November 21, 2025, and Mr. M filed his reply on December 9, 2025. [DE 23; DE 24]. The matter is therefore ripe for review under 42 U.S.C. § 405(g).

## II. APPLICABLE STANDARDS

### A. Disability Standard

To qualify for a DIB, a claimant must be "disabled" as defined under the Act. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

[4] Administrative Record page numbers are noted in the bottom right corner of the page in the Administrative Record document filed at docket entry 9.

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity that involves significant physical or mental activities done for pay or profit. 20 C.F.R. § 404.1572.

The Commissioner's five-step sequential inquiry in evaluating claims for DIB under the Act includes determinations of: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform his past relevant work based on his residual functional capacity ("RFC"); and, if not, (5) whether the claimant is able to perform other work. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through Step Four; at Step Five, the Commissioner bears the limited burden of producing evidence that other work exists in significant numbers that the claimant can perform. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), as amended (Dec. 13, 2000); 20 C.F.R. § 404.1560(c).

**B. Standard of Review**

The Court has authority to review a disability decision by the Commissioner under 42 U.S.C. § 405(g). But this Court's role in reviewing social security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The Court considers whether the ALJ used "the correct legal standards and [whether] the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence has also been

understood as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has noted that "substantial evidence" is a term of art in administrative law and that "the threshold for such evidentiary sufficiency is not high" in social security appeals. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). On the other hand, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). At a minimum, the ALJ must articulate her analysis of the record to allow the reviewing court to trace the path of her reasoning and to be assured the ALJ considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ need not address every piece of evidence so long as she provides a glimpse into her reasoning and builds the requisite "logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). If evidence contradicts the ALJ's conclusion, however, the ALJ must confront that evidence and explain why it was rejected. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

## III. DISCUSSION

### A. Summary of the ALJ's Decision Denying Benefits

In her March 22, 2024, written decision, the ALJ conducted the requisite five-step analysis for evaluating claims for disability benefits. (AR 10–24); 20 C.F.R. § 404.1520. At Step One, the ALJ determined Mr. M had not engaged in substantial gainful activity since July 17, 2022, his alleged onset date. (AR 13).

At Step Two, the ALJ found Mr. M had the severe impairments of generalized anxiety disorder, posttraumatic stress disorder ("PTSD"), major depressive disorder, and agoraphobia with panic disorder. (AR 13).

At Step Three, the ALJ concluded Mr. M did not have an impairment or combination thereof that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 13–18). In doing so, the ALJ considered Listings 12.04, 12.06, and 12.15. (AR 14). The ALJ found moderate limitations in each of the four Paragraph B areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (AR 15–18).

Before proceeding to Step Four, the ALJ found Mr. M retained the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> understand, remember, and carry out simple instructions and tasks; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; deal with occasional changes in a routine work setting; occasional interactions with supervisors and coworkers, but contact with supervisors still includes what is necessary for

> general instruction, task completion, or training, and no interaction with the public.

(AR 19). At Step Four, the ALJ determined Mr. M could not perform his past relevant work as a machinist or dye cast operator. (AR 22).

At Step Five, relying on the vocational expert's testimony, the ALJ found Mr. M could perform other work existing in significant numbers in the national economy, including work as a marker, garment sorter, and classifier. (AR 22–23). The ALJ therefore determined Mr. M had not been under a disability from July 17, 2022, through the date of the decision. (AR 23).

**B. Issues for Review**

Mr. M raises two issues for the Court's review. First, he contends the ALJ failed to properly evaluate the opinion of consultative psychologist Russell G. Coulter-Kern, Ph.D., and the prior administrative medical findings of state agency psychologists Amy S. Johnson, Ph.D., and Donna Unversaw, Ph.D. [DE 15 at 8–14]. Mr. M argues the ALJ improperly discounted Dr. Coulter-Kern's opinion because it was based on examination responses and behavioral observations, failed to adequately address supportability and consistency, and then "played doctor" by formulating an RFC after finding the psychological opinions unpersuasive. [*Id.*; DE 24 at 2–4].

Second, Mr. M contends the ALJ failed to account for his moderate limitations in concentration, persistence, and pace. [DE 15 at 14–15]. He relies on the vocational expert's testimony that employers generally would not tolerate more than ten percent

off-task time or more than one absence per month and argues the ALJ did not establish he could remain within those tolerances. (AR 77); [DE 15 at 14–15].

In response, the Commissioner contends the ALJ adequately addressed supportability and consistency when evaluating the opinions and prior administrative medical findings in the record, that the ALJ incorporated restrictions more severe than those assessed by the state agency psychologists in several respects, and that the RFC reasonably accommodated the mental limitations supported by the record. [DE 23 at 3–12]. The Commissioner also contends the vocational expert's testimony describes employer tolerances rather than establishing an additional functional limitation for Mr. M. [*Id.* at 9–12].

For the reasons below, the Court finds the ALJ adequately evaluated the psychological opinion evidence and built the necessary logical bridge from the evidence to the RFC. The Court further finds the ALJ adequately explained how the RFC addresses the concentration, persistence, and pace limitations supported by this record.

**C. The ALJ's Evaluation of the Psychological Opinion Evidence**

As stated, Mr. M first challenges the ALJ's evaluation of the psychological opinion evidence, so the Court begins there. Dr. Coulter-Kern conducted a consultative psychological examination of Mr. M on December 28, 2022. (AR 332–37). During the examination, Mr. M presented with a very anxious mood, severe apparent distress, restless motor behavior, and fast, pressured speech. (AR 333–36). He nevertheless cooperated with the examination, made appropriate eye contact, displayed logical and consistent thought processes, and remained fully understandable. (*Id.*). He performed

serial-seven subtraction without error, recalled two of three words after a five-minute delay, recalled four digits backward and six digits forward, and answered questions concerning judgment, insight, abstraction, similarities, differences, and general information. (AR 334–36).

Dr. Coulter-Kern described Mr. M's insight, reasoning, and judgment as "fair to good," noted that no formal thought disturbance was observed, and found that his thought patterns were within normal limits despite his severe apparent distress. (AR 336). Dr. Coulter-Kern further observed Mr. M could follow simple instructions with minimal to moderate repetition and clarification. (*Id.*). Dr. Coulter-Kern then provided the following medical source statement:

> Based on the client's responses to examination questions and behavioral observations, it appears that the client will have minimal to moderate difficulty understanding instructions. The client will have minimal difficulty remembering and carrying out single-step instructions. The client will have moderate difficulty remembering and carrying out multi-step instructions. The client will have moderate difficulty maintaining attention and concentration. The client will have moderate to severe difficulty responding appropriately to supervision and coworkers in a work setting. The client will have moderate to severe difficulty coping appropriately to work pressures.

(*Id.*).

The state agency psychologists also assessed Mr. M's mental functioning. At the initial level, Dr. Johnson found Mr. M had mild limitations in understanding, remembering, or applying information and in adapting or managing oneself, and moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. (AR 82–83). On reconsideration, Dr. Unversaw assessed the same

limitations. (AR 90–91). Both reviewers concluded Mr. M could manage occasional contact with the public, though not sustained, intensive interpersonal contact; could understand, remember, and carry out detailed, but not complex, tasks; could attend to tasks for a sufficient period to complete them; and could manage the stresses involved with detailed work-related tasks. (AR 85, 93).

Both reviewers also addressed Dr. Coulter-Kern's medical source statement. In their psychiatric review technique findings, each quoted his statements that Mr. M would have moderate to severe difficulty responding appropriately to supervision and coworkers and coping appropriately with work pressures, and each labeled those statements "PARTIALLY CONSISTENT A[N]D SUPPORTED." (AR 82–83, 91). When evaluating his opinion, however, each rated its supportability and consistency as "not entirely consistent" and concluded that it was "an overestimate of the severity of the individual's restrictions/limitations." (AR 84, 92).

Because Mr. M filed his claim after March 27, 2017, the ALJ evaluated Dr. Coulter-Kern's opinion and the state agency psychologists' prior administrative medical findings under 20 C.F.R. § 404.1520c. Under that regulation, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight," to any medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a). Instead, the ALJ determines the persuasiveness of each opinion or finding using several factors, of which supportability and consistency are the most important. 20 C.F.R. § 404.1520c(b)(2), (c)(1)–(5). Supportability looks to how well the objective medical evidence and supporting explanations a source presents support the opinion, while

consistency looks to how well the opinion squares with the evidence from other medical and nonmedical sources in the record. 20 C.F.R. § 404.1520c(c)(1)–(2). The ALJ must explain how she considered supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Consistent with the general standard of review, however, an ALJ need only minimally articulate her reasoning so long as the Court can trace the path from the evidence to the conclusion. *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024) (social-security adjudicators "are subject to only the most minimal of articulation requirements"); *see also Cain v. Bisignano*, 148 F.4th 490, 499 (7th Cir. 2025).

**1. Dr. Coulter-Kern's Opinion**

The ALJ addressed Dr. Coulter-Kern's opinion in both the paragraph B analysis and the RFC discussion. (AR 17–22). Ultimately, she found his social opinions unpersuasive but was persuaded by his assessment that Mr. M's ability to perform single-step instructions was less limited than his ability to perform multi-step instructions. (AR 20–21). In reaching that conclusion, she agreed that the opinion and the state agency findings showed social limitations but observed that Dr. Coulter-Kern "merely wrote that his opinions were based upon claimant's responses to examination questions and behavioral responses." (AR 20). She also found the opinions were not described using vocationally defined terms and appeared to suggest greater limitations than what the longitudinal record revealed. (*Id.*). The ALJ then explained that, despite the severe distress Dr. Coulter-Kern observed, Mr. M demonstrated normal affect, reasoning, and thought patterns, and that treatment records generally reflected symptoms that were reasonably controlled with medication. (AR 20–21).

Mr. M challenges this analysis, contending the ALJ improperly discounted Dr. Coulter-Kern's opinion because it was based on Mr. M's responses to examination questions and behavioral observations, even though mental-health assessments necessarily rest on what a patient reports, as evaluated through the psychologist's professional expertise. [DE 15 at 10–11; DE 24 at 2]. Mr. M is correct that this reason, standing alone, would not justify discounting the opinion. Mental-health opinions may properly rely on a patient's statements after those statements are assessed through the clinician's professional expertise. *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). But Dr. Coulter-Kern expressly stated that his opinions rested not only on Mr. M's responses but also on his own behavioral observations. (AR 336). Thus, to the extent the ALJ discounted the opinion on that basis, she erred. But that error does not require remand because, as explained below, it was not the ALJ's only reason for her assessment, and her remaining reasons satisfy § 404.1520c.

As stated, the decision as a whole shows that this was not the ALJ's sole basis for assessing the opinion. *See Warnell*, 97 F.4th at 1053–54 (requiring an explanation sufficient to permit meaningful judicial review). The ALJ expressly discussed the abnormal observations from Dr. Coulter-Kern's examination, including Mr. M's anxiety, severe apparent distress, restlessness, and pressured speech. (AR 17, 20–21). She also discussed the findings from the same examination that reflected intact functioning, including appropriate eye contact and cooperation, logical thought processes, normal reasoning, successful serial-seven testing, recall of two of three words after five minutes, and digit-span testing. (AR 17, 20–21, 333–36). Those were clinical

findings from the source's own examination and were relevant to supportability under § 404.1520c(c)(1).

The ALJ also compared Dr. Coulter-Kern's opinion with the longitudinal mental-health record. (AR 17, 20–21). She noted that therapy and psychiatric records from November 2022 through December 2023 repeatedly documented normal speech, appropriate mood and affect, logical and relevant thought processes, normal recent and remote memory, and normal attention and concentration. (AR 17–18, 20–21, 339, 341, 343, 345, 347–48, 350, 352, 354, 358, 361, 363, 365, 367, 379, 382–83, 412). For example, at an August 2023 Bowen Center appointment, Mr. M reported he had difficulty walking into the facility, that his chest became tight, and that he could hardly breathe; yet, the mental status examination documented appropriate mood and normal attention and concentration. (AR 18, 371–73). By December 2023, Mr. M continued to report significant social anxiety but also reported his depression was doing well and his conversations with people were better. (AR 17, 412). Those comparisons directly concern consistency under § 404.1520c(c)(2).

Importantly, the ALJ did not treat the normal mental-status findings as proof that Mr. M had no meaningful mental limitations. She acknowledged Mr. M stayed in his room, had difficulty entering stores, became overwhelmed around others, and struggled with the Bowen Center lobby. (AR 16–18, 20–21). She found moderate limitations in all four paragraph B areas and prohibited all interaction with the public. (AR 15–19). She also limited Mr. M to occasional interaction with coworkers and supervisors, simple instructions and tasks, work without hourly quotas or assembly-

line production rates, and only occasional changes in a routine work setting. (AR 19). Thus, the ALJ considered both the evidence supporting greater limitations and the evidence suggesting greater retained functioning. (AR 15–21).

Dr. Coulter-Kern examined Mr. M at the agency's request. (AR 17). An ALJ's decision to discount the opinion of the agency's own examining source warrants close review. *See Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (explaining that "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step"). Although *Beardsley* predates § 404.1520c, its point remains sound under a regulation that requires the ALJ to explain how she considered supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). *Beardsley*'s concern applies with less force here, however. Dr. Coulter-Kern did not conclude that Mr. M was disabled, and the ALJ did not reject his opinion wholesale; she found persuasive his assessment that Mr. M's ability to perform single-step instructions was less limited than his ability to perform multi-step instructions. (AR 20–21, 336). Still, the Court has reviewed the ALJ's explanation carefully. The ALJ discussed both the abnormal and the intact findings from Dr. Coulter-Kern's examination and compared those findings with a year of mental-health treatment records. (AR 17–21, 333–36, 339–67, 371–76, 379, 382–83, 412). The findings on which she relied were mental-status findings from Mr. M's psychological and psychiatric care, not physical examination findings unrelated to his mental impairments. (AR 17–18, 20–21). The

Court can trace the ALJ's supportability and consistency reasoning from that discussion. *See Scott*, 297 F.3d at 595.

Mr. M next argues the ALJ failed to acknowledge Dr. Coulter-Kern's specific opinion that he would have "moderate to severe difficulty responding appropriately to supervision and coworkers in a work setting." (AR 336); [DE 24 at 2–3]. The ALJ did not repeat that sentence verbatim when discussing persuasiveness, but she expressly referred to Dr. Coulter-Kern's "social opinions," cited his report, and explained why she found the severity suggested by those social opinions inconsistent with the record. (AR 20–21). The regulations permit source-level articulation and do not require a separate persuasiveness discussion for every statement within the same medical opinion. 20 C.F.R. § 404.1520c(b)(1).

Nor did the ALJ disregard the substance of Dr. Coulter-Kern's social opinion. She prohibited all public interaction and reduced interaction with supervisors and coworkers to occasional. (AR 19, 21). She tied those restrictions to the evidence showing Mr. M could interact with providers but had difficulty with crowded or open treatment settings and asked to change locations. (AR 21). Dr. Coulter-Kern did not translate his qualitative phrase "moderate to severe difficulty" into a more specific vocational restriction, such as no supervisor contact, less-than-occasional coworker contact, special supervision, or a particular off-task allowance. (AR 336). Mr. M likewise identifies no additional concrete social restriction the record required the ALJ to adopt. [DE 15 at 11–12; DE 24 at 2–3]; *see Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (affirming where the claimant did not identify additional restrictions supported by the record).

Mr. M separately challenges Dr. Coulter-Kern's statement that he would have "moderate to severe difficulty coping appropriately to work pressures." (AR 336); [DE 15 at 12–13; DE 24 at 3–4]. The ALJ expressly acknowledged this portion of the opinion and stated that precluding detailed work was consistent with it. (AR 21). Mr. M is correct that task complexity and work pressure are not necessarily the same functional concept. But the RFC did more than eliminate detailed work. It also prohibited assembly-line work and hourly quotas, allowed only occasional changes in a routine work setting, eliminated public interaction, and limited interactions with coworkers and supervisors. (AR 19). Those restrictions reduce production pressure, change, and social demands. (*Id.*)

Dr. Coulter-Kern did not identify a specific additional limitation flowing from his statement about work pressure. (AR 336). The ALJ was not required to adopt Dr. Coulter-Kern's terminology verbatim; she was required to explain the restrictions she found supported by the record. 20 C.F.R. §§ 404.1520c, 404.1545. The ALJ did so. She found that precluding detailed work was consistent with Dr. Coulter-Kern's work-pressure statement; linked the simple-work and production-rate restrictions to Mr. M's racing thoughts, his concentration difficulties at his prior work, and Dr. Coulter-Kern's examination; and explained that "with those limitations in place, the claimant can deal with occasional changes in a routine work setting." (AR 21). She also tied the social restrictions to Mr. M's difficulty with crowded treatment settings. (*Id.*). And she summarized the combined effect of those restrictions: "[w]ith social stressors minimized, the claimant can perform simple work within a fairly static environment

that does not require a specific production rate." (AR 22). Mr. M contends the RFC needed a separate "low stress environment" limitation [DE 24 at 4], but he does not identify what such a limitation would require beyond the restrictions on production pace, workplace changes, and social interaction that the ALJ imposed. *See Jozefyk*, 923 F.3d at 498. The Court can therefore trace the ALJ's reasoning concerning work pressures without substituting its own view of the evidence. *See Craft*, 539 F.3d at 673.

**2. The State Agency Psychologists' Prior Administrative Medical Findings**

Turning to the state agency psychologists, their findings undercut Mr. M's contention that every psychologist assessed the same moderate-to-severe social and work-pressure limitations. [DE 15 at 11–13]. Drs. Johnson and Unversaw quoted those portions of Dr. Coulter-Kern's opinion and labeled them partially consistent and supported, but they did not adopt them. (AR 82–83, 91). Instead, both rated the opinion "not entirely consistent," concluded that it was "an overestimate of the severity of the individual's restrictions/limitations," and then assessed Mr. M's functioning for themselves. (AR 84, 92). Those assessments, not the language the reviewers quoted, reflect their own findings: no significant limitation in accepting instructions and responding appropriately to criticism from supervisors, moderate limitation in interacting with the public and getting along with coworkers, and the ability to manage occasional public contact. (AR 84–85, 92–93). And, as noted above, they concluded Mr. M could manage the stresses involved with detailed work-related tasks. (AR 85, 93). In other words, the reviewers accepted that Dr. Coulter-Kern's report reflected genuine

social and stress-related difficulties but concluded those difficulties were less severe than he described. That is consistent with the ALJ's own treatment of his opinion. (AR 20–21).

Measured against those findings, the ALJ's RFC was more restrictive in several respects. The state agency psychologists assessed only mild limitations in understanding, remembering, or applying information and in adapting or managing oneself, while the ALJ assessed moderate limitations in both areas. (AR 15–18, 82, 90). The state agency psychologists allowed occasional public contact, while the ALJ prohibited public interaction altogether. (AR 19, 85, 93). The state agency psychologists found Mr. M capable of detailed but noncomplex tasks, while the ALJ limited him to simple instructions and tasks and also prohibited assembly-line work and hourly quotas. (AR 19, 85, 93). An RFC more limiting than the state agency findings may reflect "reasoned consideration given to the evidence" rather than improper medical judgment. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

Mr. M further argues the ALJ did not adequately explain the supportability, consistency, and persuasiveness of the state agency findings. [DE 15 at 12–14; DE 24 at 4]. The ALJ repeatedly noted the state agency psychologists cited evidence but did not provide a discussion explaining how that evidence supported the limitations they assessed. (AR 16, 18, 20). She nevertheless identified specific portions of their findings that were consistent with the later record and explained why she adopted or rejected those portions. (AR 16–21). Even assuming the articulation concerning the state agency findings could have been more precise, the ALJ's departures from those findings

resulted in restrictions more favorable to Mr. M. (AR 15–21, 82–85, 90–93). The state agency psychologists also remarked that Mr. M "would appear to work best alone, in semi-isolation from others or as part of a small group." (AR 85, 93). The ALJ did not adopt that language, but the RFC addresses the same concern: it prohibits all interaction with the public and limits interaction with coworkers and supervisors to occasional, meaning no more than one-third of the workday. (AR 19). Mr. M does not argue that this remark required any additional restriction. [DE 15 at 11–14; DE 24 at 2–4]. On this record, the Court can predict with great confidence that additional discussion of the state agency findings would not change the result on remand. *See Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).

**3. Alleged Evidentiary Deficit**

Mr. M also contends the ALJ created an evidentiary deficit by finding all three psychologists' opinions unpersuasive and then formulating the RFC herself. [DE 15 at 11–12]. An ALJ may not substitute her own lay judgment for medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). At the same time, an ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). "Thus, there is not an evidentiary deficit simply because an ALJ rejects the opinions of the agency reviewing and consulting physicians. Rather, the question is whether the rest of the record supports the ALJ's RFC assessment." *Laughton v. O'Malley*, No. 1:23-CV-35-HAB, 2024 WL 748752, at *5 (N.D. Ind. Feb. 22, 2024).

No such gap exists here. The ALJ did not reject the psychological evidence wholesale. She was persuaded by Dr. Coulter-Kern's assessment that single-step instructions presented less difficulty than multi-step instructions and used that assessment, together with the treatment record and Mr. M's testimony, to limit him to simple instructions and tasks. (AR 21, 336). She was also persuaded by the state agency psychologists' finding of moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. (AR 17–18, 82, 90). Although she made that finding in her paragraph B analysis, which is not itself an RFC assessment, *see* SSR 96-8p, 1996 WL 374184, at *4, the RFC's social and pace restrictions accommodate those same moderate limitations. (AR 19, 21). And, as discussed above, where the ALJ departed from the state agency findings, she did so in Mr. M's favor. *See Burmester*, 920 F.3d at 510. That sets this case apart from the decisions on which Mr. M relies, in which the ALJ declined to adopt any medical opinion and was left to construct the RFC without medical support. [DE 15 at 8–9, 11].

Nor was the ALJ required to develop the record further. Mr. M points to the regulations' provisions allowing an ALJ to recontact a medical source, request additional evidence, or order a consultative examination. [DE 15 at 9]. Those measures apply when the evidence is insufficient to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1520b(b). That was not the case here. The record contained a consultative psychological examination, findings from two state agency psychologists, and more than a year of treatment records, and the ALJ relied on portions of each. (AR 17–22). Moreover, Mr. M was represented by counsel at the hearing and does not

identify any additional evidence that further development would have produced. (AR 10); *see* *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017).

Accordingly, the Court finds the ALJ adequately considered the supportability and consistency of Dr. Coulter-Kern's opinion and the state agency psychologists' prior administrative medical findings, and that substantial evidence supports her evaluation under 20 C.F.R. § 404.1520c. The Court therefore finds no reversible error in the ALJ's evaluation of the psychological opinions

**D. Concentration, Persistence, and Pace**

Mr. M next argues the RFC fails to adequately account for the ALJ's finding that he has moderate limitations in concentrating, persisting, or maintaining pace. [DE 15 at 14–15]. An RFC must account for limitations supported by the medical record, including supported limitations in concentration, persistence, or pace. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). The question is whether the RFC is tailored to the claimant's limitations as reflected in the record. *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020).

Here, the ALJ expressly found a moderate limitation in concentration, persistence, or pace. (AR 18). In reaching that finding, she acknowledged that social situations could exacerbate Mr. M's symptoms and that he testified his mind races. (AR 18). She noted that a May 2023 psychiatric evaluation showed slight fidgeting and fair concentration. (AR 18 (citing AR 374–76)). She also observed that, during the August 2023 appointment where Mr. M reported chest tightness and difficulty breathing because of anxiety about entering the Bowen Center, his attention span and

concentration were normal. (AR 18 (citing AR 371–73)). The ALJ further cited repeated normal attention and concentration findings from therapy and psychiatric appointments between November 2022 and December 2023. (AR 18 (citing AR 339, 341, 343, 345, 347–48, 350, 352, 354, 358, 361, 363, 365, 367, 379, 382–83, 412)). The ALJ also directly considered whether Mr. M would be excessively absent or off task. She stated:

> Although some of the claimant's testimony suggests that he would be excessively absent from work, excessively off-task while at work, and unable to remain outside of his home and be around people on a sustained basis, the severity of those assertions is not supported by the record. Accordingly, corresponding limitations are not included as part of the claimant's residual functional capacity assessment.

(AR 19).

The ALJ then explained why she reached such a conclusion. She relied on the longitudinal concentration findings, Mr. M's ability to attend most outpatient mental-health appointments despite documented difficulty leaving home, and the results of Dr. Coulter-Kern's examination. (AR 18–22). That conclusion is also consistent with the state agency psychologists' narrative finding that Mr. M could "attend to tasks for a sufficient period to complete tasks," even though they assessed moderate limitations in concentration, persistence, or pace. (AR 82, 85, 90, 93).

The resulting RFC limited Mr. M to simple instructions and tasks and prohibited work requiring a specific production rate, including assembly-line work and hourly quotas. (AR 19). It also limited him to occasional changes in a routine work setting and reduced social interaction, recognizing the ALJ's finding that social stressors could exacerbate his symptoms. (AR 18–21). The ALJ specifically linked the simple-work

limitation to Mr. M's testimony that his mind races and linked the production-rate restriction to his testimony that he struggled with numbers and concentration toward the end of his machining work. (AR 21).

A moderate paragraph B limitation does not automatically establish a particular percentage of off-task time. Under the regulations, a moderate limitation means that functioning in the area is "Fair." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c). The Seventh Circuit has recognized such a rating can be consistent with the ability to perform simple work at a consistent pace, depending on the evidence and the ALJ's explanation. *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). More recently, the Seventh Circuit affirmed where the ALJ satisfied the minimal articulation requirement in assessing mental-health evidence and tied the RFC to the record. *Cain*, 148 F.4th at 498–99.

Mr. M relies on *Lothridge v. Saul*, 984 F.3d 1227 (7th Cir. 2021), to argue that the ALJ erred here. [DE 15 at 14–15]. There, the Seventh Circuit found the ALJ's decision did not address whether the claimant could satisfy the vocational expert's on-task requirement, discounted the opinion that might have supported the RFC, and contained internal inconsistencies concerning the claimant's concentration and ability to complete tasks. *Lothridge*, 984 F.3d at 1233–34. The Court therefore concluded the ALJ had not accounted for the claimant's limitations "in a meaningful way." *Id.* at 1234.

The decision here does not share those defects. Unlike the ALJ in *Lothridge*, the ALJ here confronted Mr. M's ability to stay on task and attend work directly. She acknowledged his testimony suggesting he would be excessively absent and off task,

found the severity of those assertions unsupported by the record, and declined to include corresponding limitations. (AR 19). She returned to the point at the close of her RFC analysis, explaining that although his testimony suggested he "would be excessively off-task due to social stressors exacerbating his symptoms, the record reflects otherwise," because the longitudinal treatment records showed he "can leave home to attend most of his outpatient appointments." (AR 22). She then imposed restrictions directed to task complexity, pace, workplace change, and social stressors. (AR 19, 21–22). And although the ALJ here, like the ALJ in *Lothridge*, discounted portions of a state agency psychologist's findings, she did not discount the findings bearing on concentration; she was persuaded by the state agency psychologists' assessment of a moderate limitation in that area. (AR 18). Thus, unlike *Lothridge*, the Court is not left to guess whether the ALJ considered Mr. M's ability to stay on task. (AR 18–22).

The vocational expert's testimony does not require a different result. The vocational expert testified employers generally would not tolerate more than ten percent off-task time or more than one absence per month. (AR 77). That testimony establishes the vocational consequence if such a limitation exists; it does not establish that Mr. M himself would be off task more than ten percent of the workday or absent more than once per month. (AR 77). It remains the claimant's burden to present evidence of limitations affecting his capacity to work. 20 C.F.R. § 404.1512(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also* *Thorlton v. King*, 127 F.4th 1078, 1081 (7th

Cir. 2025) ("Establishing the existence of an impairment is not enough. The claimant must present evidence of limitations affecting their capacity to work.").

Mr. M identifies no medical opinion assigning an off-task limitation greater than ten percent or more than one absence per month. [DE 15 at 14–15; DE 24 at 5]. Dr. Coulter-Kern assessed moderate difficulty maintaining attention and concentration but did not opine as to a specific off-task percentage or absence rate. (AR 336). Nor did the state agency psychologists. On their mental RFC worksheets, both rated Mr. M moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 85, 93). But neither translated those ratings into an off-task or absence limitation. Instead, both explained in narrative form that Mr. M could "attend to tasks for a sufficient period to complete tasks." (*Id.*).

Mr. M does not rely on these worksheet ratings, and the Court will not develop an argument on his behalf. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). Even considering them, however, they do not require remand. An ALJ may rely on a source's narrative explanation, but she "still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections" of the mental RFC form. *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) (citing *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)). The RFC does so here. Its prohibition on public interaction and its limit of occasional interaction with coworkers and supervisors

reduce the distraction posed by working near others, and its restriction to simple instructions and tasks without a specific production rate addresses the ability to maintain a consistent pace. (AR 19, 21); *see Pavlicek*, 994 F.3d at 783 (explaining that a moderate limitation "seems consistent with the ability to perform simple, repetitive tasks at a consistent pace"). And unlike in *DeCamp*, where the ALJ "focused her analysis on the doctors' bottom-line conclusion" without accounting for the claimant's concentration difficulties, 916 F.3d at 676, the ALJ here expressly considered and rejected the claimed off-task and absence limitations based on the longitudinal record. (AR 18–19, 22). Because the ALJ addressed the relevant evidence and explained the restrictions she adopted, the Court finds no reversible error in the treatment of concentration, persistence, or pace. *See Jozefyk*, 923 F.3d at 498.

## IV. CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision. The Clerk is **DIRECTED** to enter judgment for the Commissioner and against Plaintiff.

**SO ORDERED** this 6th day of November 2026.

s/Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge